Judge Cabell
delivered his opinion, in which the other Judges concurred.*
Several objections were made by the counsel for the appellant, to the form of the proceedings in this case. Before I examine them, I will remark that this Court has often declared, that the same strictness as to form will not be required in actions for freedom, as in other cases; and that these actions, like actions of ejectment, will be moulded into such form, as is best calculated to try the real question in controversy.
The first objection is, that the issue was not joined on the plea of not guilty, but on the protestation in that plea *136 that the plaintiffs were the slaves of the defendant. It is very true that that was an irregularity; but as the issue was joined upon the fact whether the plaintiffs were free or not, the merits of the controversy between the parties were fairly brought in issue; and it is too late, after verdict, to take advantage of the informality in joining the issue.
The next objection is, that the judgment directs the plaintiffs to be discharged from the imprisonment in the declaration complained of. The judgment that the plaintiffs recover their freedom, and the damages assessed by the jury, had the full effect to discharge them from the custody of the defendant; the additional direction complained of, was, therefore, mere surplusage, which cannot vitiate the judgment. Nor would any useful purpose be answered by the correction of this irregularity, since no question of costs is involved.
It was next objected, that judgment should have been rendered for Amos only; because he alone declared as plaintiff, suing for himself and the other petitioners, who were infants; and it was contended, that if the verdict had been for the defendant, a judgment thereon would have been no bar to a new suit by the others. Although the declaration was, in this respect, informal; yet I think that all the petitionei’s were substantially plaintiffs; and as their case was fairly tried, had it been against them, it would have been so far a bar, as that no Court would have given them permission to bring another suit. The declaration in the ease of Maria v. Surbaugh, 2 Rand. 228, was in the same form; yet it did not preclude the Court from deciding the merits of the case, as to the children of Maria.
I coxxxe now to the more important questions made in this case.
The verdict of the jui'y is as follows: “We find for the plaintiffs their freedom and one cent damages; subject to the opinion of the Court, whether the removal of Richard Wetherhead, with his family, from the State of Maryland to the county of Rockingham, in this State, in the month *137 of November, 1800, and the bringing with him the plaintiffs, and the taking the oath prescribed by law, within 60 days after his arrival, in Ihe county of Rockingham, by Elizabeth, the wife of the said Richard, was a compliance with the law regulating the importation of slaves. If, in the opinion of the Court, the law be for the defendant, then we find for the defendant.”
It is contended by the counsel for the appellant, that this verdict is too imperfect, on account of its uncertainty, to enable the Court to render judgment.
This is not a special ver iict, in the usual acceptation of the term; a verdict, finding all the facts supposed to belong to the case, and referring to the Court the decision of the law arising on those facts. The jury do not profess to find all the facts which constitute the case. On the contrary, the finding is .a general one, that the plaintiffs are free, unless, upon a single, point of law reserved, the Court shall be of opinion that the law is for the defendant. There can be no difficulty in comprehending the true nature of a verdict like this, although writers, in attempting to name it, may not have been fortunate in using terms of great precision. In 2 Tidd’s Prac. 809, it is said, “another method of finding a species of special verdict is, when the jury find a verdict generally for either party, but subject nevertheless, to the opinion of the Court above, on a special case, stated by the counsel on both sides, with regard to a matter of law.” In 1 Archbold, 192, it is said, “ also where a difficulty in point of law arises, the jury may, instead of finding a special verdict, find a general verdict, for the plaintiff, subject to the opinion of the Judge, or the Court above, on a special case stated by the counsel on both sides, with regard to the matter of law.” It is not material, whether, with one of these writers, we call this proceeding “ a species of special verdict,” or with the other, “a general verdict” with “ a special ease.” They both mean the same thing; a general conclusion drawn by the jury, from the facts, in favor of one or the other party; subject, however, to the opinion of the *138 Court as to the law arising on a case specially stated by the jury- Such a general conclusion for one party, necessarily carries with it the idea that that party must prevail, unless the law upon the special case referred to the Court, shall be against him. All facts, not found in the special case, are excluded from the consideration of the Court, or are negatived by the general finding in his favor. The- “special case” would be nugatory, if the Court were to go out of it.
The case specially stated by the jury, is, that Richard Wetherhead removed with his family from Maryland to Rockingham county in Virginia, in November, 1800, and brought with him the plaintiffs; and that Elizabeth, the wife of the said Richard, within 60 days after his arrival in Rockingham, took the oath prescribed by law; and the question submitted by the jury is, whether the taking of the oath by the wife, was a compliance with the law regulating the importation of slaves.
The Act of 1792, Rev. Code, ch. 103, prohibited the importation of slaves, but contained an exception in favor of persons removing from any other State, and becoming citizens of this, and bringing slaves with them, provided that within 60 days after such removal, they take, before some Justice of the Peace, a certain oath therein prescribed; the substance of which was, that the slaves brought in by them were not brought in with intention to sell them, nor were they imported from Africa, or the West Indies, &tc.
Whether the wife of a person removing to this State, and bringing slaves with him, can take the oath to any legal purpose, merely because she is ivife, was admitted to be too plain for argument; for she cannot swear as to the intention of the.husband, nor is she the person bringing the slaves; and yet this is the only question submitted by the jury. The language of the jury is plain and unequivocal, and will not bear any other rational construction.
But it is said, that this question is so plain that we cannot presume the parties intended to submit it: that no *139 lawyer would have made it, nor would the Judge have suffered it to be put.upon the record. This is, indeed, a novel argument. If the records of this Court be searched, it would be found that questions as plain (plainer there could not be) have been often made, and in some instances, incorrectly decided, in the Inferior Courts. It would be strange indeed, if the very plainness of the case were to be made the only foundation of doubts and difficulties.
It is however contended, that there may be cases in which the wife may be the proper person to take the oath, as where the slaves are her separate property, or where they are held by her as a trustee, or as executrix or administratrix, &c. But, I think it very clear, from the positive finding of the jury, that the jury did not mean to submit a question on any such case. I think it very manifest, that the Act of Assembly intended the oath to be taken by the proprietor of the slaves; although the proprietor is not otherwise described than as the person removing and bringing the slaves with him. When, therefore, the jury speak of Richard Wet her head, and apply to him the very words found in the Act of Assembly, removing and bringing the slaves with him, they intended to speak of him as the proprietor; and when they speak of the wife, they speak of her merely as wife. Besides, if the wife had been the proprietor, it cannot for a moment be believed, that the jury would have been permitted to be silent as to a fact, which must have been known to the counsel and the Court, to be so important to the correct decision of the cause. But be this as it may, it is sufficient to say, that it does not appear by the verdict, that any of the supposed cases existed, or were alleged by the parties to exist; or if alleged to exist, the jury have negatived it, by not finding it to exist. No verdict of this kind could ever stand, if the party or the Court were allowed to suppose facts, not found in the special case. It is not necessary that the jury shall expressly find, that certain facts do not exist. The mere silence of the jury is tantamount to.an express find *140 ing that no facts exist, repugnant to the general conclusion they have drawn in favor of the party. In the case of Hook v. Nanny, 2 Munf. 379, (which, like this, was a case for freedom,) the jury find certain facts, and then conclude, “ we therefore find the plaintiffs free.” Judgment was rendered for the plaintiffs, and was affirmed.by the unanimous opinion of this Court. Judge Coalter remarked, “The jury, in this case, find two facts: 1. That Nanny was brought into this Commonwealth by Jones, from North Carolina, subsequent to the 5th of October, 1778. 2. They also find from inspection, that the plaintiff is a white woman. I say nothing,” (adds the Judge,) “of the other finding, viz: ‘that if the plaintiff was a slave, it doth not appear that Jones did comply with the provisions of the Act to prevent the farther importation of slaves,’ because, (says the’Judge,) the jury need not find the negative of a fact, which the defendant must shew, in order to support his plea of justification. That part of the verdict, therefore, must be clearly rejected as surplusage. The case will stand upon the other two facts, accompanied by the general finding that the plaintiffs are free. The facts aforesaid'are entirely distinct-in their nature, and not depending at all on the same tesfimon}-; and either of them, if found upon proper legal testimony, will entitle the party, ipso facto, to freedom, unless the defendant can shew something to take his case out of their influence.” In the case of Garnet v. Sam, 5 Munf. 542, the same principle is advanced by this Court. Suppose, in the case before us, the jury had found the plaintiffs free, subject to the opinion of the Court, on the following fact; that fVet her head removed from Maryland to this State, in the year 1800, •bringing the plaintiffs with him as slaves. Most unquestionably, this Court would adjudge them to be free. But, as it was proved to the jury, that the wife took the oath, they submit the single question, whether this taking of the oath was a compliance with the law; and as it is admitted that it was not, I cannot see how it can make the case of the defendant better than if it had not been stated at all.
*141 ■The objection, therefore, as to the uncertainty of the verdict, is without foundation.
It is said, that according to the principles established in Garnet v. Sam &c. 5 Munf. 542, and Abram, &c. v. Matthews, 6 Munf. 154, it might have been left to the jury, to presume from the facts found, that the wife, in this case, was the proper person to take the oath. In both of these cases, more than 20 years had elapsed, between the importation of the slaves and the commencement of the action; and it was decided, that such a lapse of time should be left to the jury as the foundation of a presumption, that the oath required by law had been rightly taken. And considering the great difficulty which would generally attend the proving such a fact, after such a lapse of time, nothing could be more reasonable than such a presumption. But such presumption, however well founded, was liable to be repelled by proofs. In the present case, the time was short of 20 years. It is not pretended that the husband took the oath. That fact is negatived by the express finding, that the oath was taken by the wife. The facts, which alone could justify the oath by the wife, do not depend upon such fugitive testimony, as did the fact presumed in the cases referred to. If the wife had the separate property in the slaves, or if she were trustee, executrix or administratrix, such fact might have been proved by testimony in writing or on record; or, if that evidence had been lost, its former existence might have been established by parol testimony; or, if the husband had died within the 6C days, that fact, (admitting it to be sufficient to justify the oath by the wife,) was very different from the fact presumed in the cases referred to. It did not depend upon the testimony of a single witness who may have died. It must have been a fact of notoriety, and susceptible of easy proof. I therefore think it ought not to have been left to the jury, to presume such facts as would justify the wife in taking the oath, until at least 20 years had elapsed. But be this as it may, we do not know that any such question *142 was made at the trial; and it is now too late to make it. If such presumption was pressed on the jury, it might have been, and probably was, repelled by opposing testimony. The jury have not, in fact, made any such presumption; and it is not competent to the Court to make it for them.
But it is contended, that the right of the appellees to freedom, under the Act of 1792, was taken away by the Act of 1819, which releases all forfeitures and penalties incurred under former laws, and not already recovered or enforced. 1 Rev. Code, 422, sec. 4. It may he admitted, that the right of a slave to be free, in consequence of being imported contrary to the Act of 1792, was a forfeiture imposed upon the owner, by way of penalty. But at the very moment that this forfeiture was incurred by the owner, under that Act, a perfect right to freedom vested in the slave, by the same Act. I call it a perfect right, because its enjoyment might be enforced by due course of law, the moment it vested; and it vested as soon as the violation of the law was complete; viz: as soon as 12 months elapsed from the importation. He was from that moment a free man “illegally held in slavery.” If it were not so, he could never recover freedom; for, it is the business of Courts, not to create, but only to enforce existing rights. Again, our laws declare, “that all children shall be bond or free, according to the condition of the mother. ” Maria v. Surbaugh, 2 Rand. 228. If a female slave had been brought into this State, under the Act of 1792, had remained here 12 months, (the requisites of the law not being complied with,) and then had had a child, and died; it is perfectly clear, that such child would be entitled to, and would receive his freedom; and this decisively proves, that the mother was in fact, free, although she had not been declared so by the judgment of a Court of Law. The Act of 1819 contemplated cases, in which rights might be absolutely vested under former laws, which were not intended to be disturbed; and also cases in which forfeitures had been incurred, where no right had vested in any particu *143 lar persons. The Act of 1S06 afforded instances of this latter description. That Act declares, that an illegal importer of slaves shall forfeit all right to the slaves, and that such right shall vest, in the overseers of the poor of any county, who should apprehend, or attempt to apprehend them. The right forfeited by the owner, did not vest, however, in any one, until the slaves were apprehended, or until an attempt was made to apprehend them. These were the forfeitures, and such as these, that the. Act of 1819 intended to remit; and such remission violated the rights of no one. But under the Act of 1792, a right to freedom was actually vested in the imported slaves; and it was the intention of the Act of 1819, to preserve that right.
The judgment must be affirmed.

 The President absent.