Cabe, J.
I think it clear, upon the findings in this special verdict, that Blake never lost the character of citizen of Massachusetts which he had by his birth. He removed to Virginia, married a wife here, received the two slaves with her, and returned, with his wife and child, and the two slaves, to Massachusetts. This might all have been done in a residence of twelve months. The jury finds no decía *621 ration made by him of any intention to make a permanent settlement in Virginia; no house or land bought; no business followed; nothing to distinguish him 1'rom a sojourner in the land. He married a citizen of this state, to be sure; but, it would seem, only to take her to his own country. In Murray v. M'Carty, 2 Munf. 393. it was decided, that a Virginian marrying in Maryland, going thither, with the declared intention of residing in the state, and living there, between three and four years, did not lose his citizenship here. In Barnett v. Sam, Gilm. 232. Mrs. Teas removed to North Carolina, and resided there three years; yet on her return, it was decided, that “ never having renounced her character of citizen of Virginia, nor acquired that of citizen of North Carolina, she did not come within the fourth section of the statute of 1792. If these cases are authority (and they have never been overruled), they decide the point, that, under the finding here, Blake never ceased to be a citizen of Massachusetts. He carried the slaves to Boston, with the declared intention of a permanent residence there; rented a house; opened a store; and, his business disappointing him, and his wife’s health failing, he returned, after a residence of about fourteen months, to Virginia. I am clearly of opinion, that on thus returning, and bringing the slaves with him, he came fairly within the general prohibition of the statute of 1792, and could only protect himself, by going before a magistrate within sixty days, and taking the oath thereby prescribed.
It was said, that after the great lapse of time which has taken place, it ought to be presumed, that every thing was properly done which the law required. This might have been a proper subject for a motion to the court to instruct, or a fair argument to the jury, who were at liberty to draw conclusions from facts: but it is too well settled to be questioned, that upon a special verdict, the court can presume nothing. See Abraham v. Matthews, 6 Munf. 159. M’Michen v. Amos, 4 Rand. 134. George v. Parker, Id. 659.
Thinking the point, on which I have rested my opinion very clear, I have not noticed the effect, on this subject, of *622 the constitution of Massachusetts and their judicial construclion of it. I will remark, however, that my impression is, that from this source, as well as that I have relied on, the paupers derive a good cl aim to their freedom. But it is a point which I have not been able (for the want of books) so thoroughly to investigate as I could wish.
I am of opinion, that the judgment should be reversed, and judgment entered for the plaintiffs in error.
Cabell, J concurred.
Tucker, P.
The plaintiffs in this case rest their right to freedom, 1. upon the constitution and laws of the state of Massachusetts, and 2. upon the statute law of Virginia. It is contended, that Betty and Pleasant, by being removed by their master from Virginia to Boston, in 1797, became free under the former; or if not, that their removal back again to Virginia, after they had lost the character of Virginia slaves, gave them a right to freedom under the statute of 1792, at that time in force.
As to the first; the jury has found the constitution of Massachusetts, containing a provision, like our own bill of rights, declaring that “all men are born free and equal.” This, it would seem, is the only provision in the laws or constitution of that state, upon this interesting subject. Looking to the actual state of that commonwealth, and knowing, as we all know, that its slaves were few in number, at the time of the adoption of its constitution, we should be disposed to take this declaration less as an abstraction, than we must regard that which is contained in our own bill of rights. We should readily extend it to mean at least as much as the common law, which does not recognize slavery as reconcile-able with a residence upon british soil. I am inclined to think, however, it may go farther. The common law, I take it, is to be considered rather as declaring the mere status of the party, while in Great Britain, than as annulling the bond by which he is fettered, unless he asserts his right and establishes it by the adjudication of a competent tribunal. *623 Then, indeed, it passes in rent, adjudicatam; and, upon well received principles of national law, this decision upon the right, by a tribunal having complete jurisdiction over the subject, is conclusive every where. But, unless the right of the slave is so asserted and established, the common law has not the effect of knocking off his shackles; nor can it be invoked as his protector, upon his return to that country where he had formerly been a slave. Such, I incline to think, is the substance of the cases of Williams v. Brown, 3 Bos. & Pull. 69. and of “ The Mongrel woman Grace,” decided by lord Stowell, and mentioned by counsel and by judge Green in Hunter v. Fulcher, 1 Leigh 179. 181. In Massachusetts, however, it seems, that the constitution of the state must have been interpreted to have a more extensive operation, as it appears to have been decided, that the issue of a female slave, though bom prior to the constitution, was free; 2 Kent’s Comm. 205. If this be so, the constitution has received an interpretation, which goes to divest the title of the master, to break the bonds of the slave, and to annul the condition of servitude. It emancipates and sets free, by its own force and efficacy, and does not await the enforcement of its principles by judicial decision. It is more operative than the common law, and more resembles the effect of our statute declaring free all slaves imported contrary to law. But this depends upon the construction of the constitution of Massachusetts by its courts, which we would of course respect and follow, if we were sufficiently advised of them. But without their reports here, we should, perhaps, venture too far to rest our decision upon the Massachusetts constitution. It is not deemed necessary. The case may be decided upon the Virginia law.
By the statute of 1792, it was declared (and the provision was in force at the time of this transaction), that “slaves which should thereafter be brought into this commonwealth, and kept therein one whole year, or so long at different times as should amount to one year, should bo free.” From the operation of the statute were excepted “ those persons who might incline to remove from any of the U. States and be *624 come citizens of this, upon taking certain oaths within a limited time.”
In this case, it appears, that Blake was a native of Massachusetts, who, when a young man, removed to Southampton, Virginia, married, and received the negroes Betty and Pleasant with his wife. It might, perhaps, well he questioned, whether by this finding we should be justified in inferring that Virginia became the domicil of Blake, as it appears, that, some time after his marriage, he took his wife and slaves to his native state, and there went into business. Admit, however, that he did acquire a domicil in Virginia, we next find, that he left this state in 1797, taking with him his wife and child, and the plaintiffs, then small girls. ' He arrived in Boston in July 1797, where he spent three months in visiting his friends, after which he rented a house, in which his family resided, opened a store, and declared his intention to spend the rest of his days there; and there, accordingly, he continued to reside and carry on business until July or August 1798. This constituted a complete domicil in Boston. Whether Blake ever had a domicil in Virginia or not, it is very certain, that no evidences or declarations are found of his intention to make it the place of his permanent abode; and when, therefore, he returned from this absence,— of what duration we know not,—to the land of his nativity, which he does not appear to have renounced, and declared his intention of spending his life there, and set up an establishment and a mercantile concern, I cannot but consider him as reinvested, to all intents and purposes, with his original character of a man of Massachusetts. To Virginia he was no longer bound. He had owed her a temporary allegiance for temporary protection, but the tie was dissolved, so soon as he returned to his native state, and settled himself in business, with a design of permanent residence.
As to the length of time of his residence in Boston, that, it would seem, is unimportant, except as an index of his real purpose. “There is no fixed or definite period of time,” says chancellor Kent, “ requisite to create the domicil of a party. The residence to create it, may be long or short, ac *625 cording to circumstances. It depends on the actual or presumed intention of the party.” 2 Kent’s Comm. 346. in note. As soon as the act is unequivocally done, and the intent clearly demonstrated to fix the residence or domicil of the party, so soon do all the consequences flow from the establishment of that domicil. From the moment the intent of Blake was shown by the correspondence of his acts with his declared intention to make Boston his permanent residence, he became at once domiciliated there. And if he had removed the next day to Virginia, although that might have thrown doubts over the sincerity of his previous declarations, it would not have changed his status for the time being, if we could rest assured that those previous acts and declarations had indeed been bond fide.
Blake, then, having become an inhabitant of Boston, resident, and domiciliated there, in about twelve months, is induced by the state of his wife’s health, to change his plans, and come to Virginia once more. Having acquired a residence or domicil in Boston, he was in the strictest sense of the words of our statute, “a person desirous of removing from one of the U. States.” But be this as it may, when he came to Virginia with his slaves, their destiny having been linked to that of their master, and they having acquired like him a Boston home, he was bringing into Virginia, simes'vrhich bad ceased to belong to tills commonwealth. This was directly within the law.
The verdict is not very definite as to the length of time the slaves were or have been in Virginia, all together. But in M’Michen v. Amos, 4 Rand. 134. it was very justly said, that the same strictness, as to form, will not be required in actions for freedom as in other cases. For, the master is deeply interested in not prolonging the litigation by mere technicalities. Here we find, that Blake left Boston for Virginia in 1798, bringing the slaves with him; and we find, that since her return, Betty has had two children ; and she is here, moreover, when she exhibits her petition thirty years afterwards. We must take it, then, that she was brought hack to Virginia, and has been kept here *626 more than one whole year; and if so, she is free, unless her master complied with the law.
There is no question, that after twenty years a jury may presume, that the requisitions of this statute have been complied with, if, in the meantime, there has been no suit for freedom, and if there be no circumstances to repel the presumption. 5 Munf. 542. 6 Munf. 159. 4 Rand. 141. 659. In all these cases, the principle is clearly recognized. But the jury alone can presume this fact. It is like most presumptions, liable to be rebutted, and therefore cannot be made by the court. In this case, the verdict is silent, and the fact must therefore be taken to be against the defendant.
The consequence is, that the plaintiffs are entitled to their freedom, and to a judgment in their favor upon the verdict of the jury.
Judgment reversed, and judgment entered for the paupers.